UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENT BUILDING SERVICES, LLC,
                              Petitioner,

          -v-                                      17-CV-3509 (JPO)

JONATHAN L. KESSLER,                               OPINION AND ORDER
                              Respondent.

J. PAUL OETKEN, District Judge:

Petitioner Kent Building Services, LLC ("Kent") brings this action under Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, to vacate an arbitration award issued against it. Respondent Jonathan Kessler opposes Kent's petition and cross-moves to confirm the arbitration award. For the reasons that follow, Kent's motion is denied and Kessler's motion is granted.

**I.     Background**

This action arises from an arbitration commenced by Kessler in February 2016 against Kent, a company that provides janitorial and maintenance services. (Award at 1, 3.)[1] Kessler was hired to serve as Kent's president in April 2013. (Award at 6.) The parties entered into an employment agreement, which obligated them to arbitrate "[a]ny claim or controversy" arising out of the "Agreement, equity ownership or the breach of th[e] Agreement." (Employment Agreement ¶ 16.) In December 2013, Kessler was fired by Gil Neuman, Kent's Chief Executive Officer. Kessler then filed a demand for arbitration pursuant to the arbitration clause, alleging

---

  [1]   The Court granted Kent's request to file the record of the arbitration hearing in hard copy only. (Dkt. No. 8.) Consequently, citations to the record are to the hard copy materials rather than to docket entries.

1

breach of contract, wrongful termination, conversion, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.[2] (Award at 1–2.)

In relevant part, the Employment Agreement provides:

**4. Termination**

. . .

(d) **Termination by Company For Cause.** The Company may terminate Mr. Kessler's employment "for cause" at any time. As used herein, "for cause" shall mean any one of the following:

- Gross misconduct or gross mismanagement of the department of the business of the Company for which Mr. Kessler was responsible
- Repeated failure to effectively or efficiently perform Mr. Kessler's duties under this Agreement
. . .
- [I]ntentional violation of any federal, state or local law or regulation that materially adversely affects the Company, its directors, or its members, or
. . .
- Commission . . . of any intentional act of dishonesty involving the Company; or Commission . . . of an act materially and adversely affecting the reputation of the Company; or Commission of a serious violation of any of the Company's personnel policies, including but not limited to violations of the Company's policies against any form of harassment or;
- Poor job performance as determined in the discretion of the CEO

(Employment Agreement at ¶ 4.) If Kessler was terminated without cause, he was entitled to a severance payment.

At the arbitration hearing, Neuman testified to the numerous concerns about Kessler's performance that arose as the employment relationship unfolded. One specific incident, however, merits particular attention: in September 2013, Kent hired Chi Ming Li as operations

---

[2] Kessler later withdrew his conversion claim, and his implied covenant of good faith and fair dealing claim was dismissed as duplicative of his breach of contract claim. (Award at 2.)

manager. (Award at 10.) Kessler then delegated to Li the supervision of daily operations at certain sites, including 100 Challenger Road in Ridgefield, New Jersey, a site which was especially important to Kent as a potential inroad to further business in New Jersey. (Award at 11–12.) On October 17, Kessler and Li inspected the Challenger Road site, and Kessler observed insubordination and poor work performance by Ana Ocasio, a maintenance worker whom Li had hired. (Award at 12.) Kessler told Li to fire Ocasio, but when her replacement later quit, Li hired Ocasio back without Kessler's knowledge or authorization. (Award at 13.)

On December 12, the New Jersey Department of Labor contacted Kent's Human Resources Director, Simona Albu, about a complaint that Ocasio had filed alleging unpaid wages. (Award at 13.) As a result of this complaint and the ensuing HR investigation, Kessler became aware that Ocasio had been working at 100 Challenger Road without his knowledge for approximately five weeks. (Award at 14.)

According to Neuman, the Challenger Road investigation was "the straw that broke the camel's back," and, on December 16, he called Kessler to fire him. (Award at 16–17.) Because Kent purported to terminate Kessler "for cause," he was not paid severance, to which he would have been entitled had he been terminated without cause. (Award at 22.) He was also fired prior to the vesting of a 12% ownership stake equity incentive, which he would have been entitled to under the compensation provisions of the employment agreement. (Award at 22–23; Employment Agreement ¶ 3(b).)

The arbitrator concluded that Kent had breached the employment agreement by firing Kessler without cause and failing to pay him severance. (Award at 34.) Critically, the arbitrator made a factual determination that "the only matter considered by Neuman concerning his decision to terminate [Kessler] was the incident that occurred at 100 Challenger Road." (Award

3

at 34.) The arbitrator next considered whether the Challenger Road incident could support Neuman's decision to exercise his discretion under the contract to terminate Kessler for "poor job performance." She concluded that Neuman acted arbitrarily and irrationally, and thus breached the implied covenant of good faith and fair dealing in the employment agreement, by terminating Kessler on this basis. (Award at 38–39.) She also rejected Kent's remaining affirmative defenses, including that Kessler grossly mismanaged its business and engaged in gross misconduct. (Award at 39.) Because Kessler was terminated "without cause," the arbitrator awarded Kessler a severance payment equivalent to six months' salary. (Award at 39, 42.) Finally, she denied his remaining claims for wrongful termination and unjust enrichment as unsupported by the record evidence. (Award at 40–41.)

Kent filed a petition to vacate the arbitrator's award, challenging only the determination that Neuman's termination of Kessler breached the implied covenant of good faith and fair dealing. (Dkt. No. 1.) Kessler filed a cross-motion to confirm the arbitration award. (Dkt. No. 19.)

## II.     Legal Standard

On a motion or vacate an arbitration award under the Federal Arbitration Act, judicial review of the award is "'severely limited' so as not to frustrate the 'twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (first quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009), second quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)). To obtain vacatur, a petitioner "must clear a high hurdle" because "[i]t is not enough for petitioners to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). Instead, "[w]here the parties have agreed to submit an issue for

arbitration, courts will 'uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached.'" *ACP Inv. Grp. v. Blake*, No. 15 Civ. 9364, 2016 WL 5947290, at *2 (S.D.N.Y. Oct. 13, 2016) (quoting *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003)).

"The FAA permits vacatur of an arbitration award only under four narrow circumstances":

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Blake*, 2016 WL 5947290, at *2 (quoting 9 U.S.C. § 10(a)).

In this case, however, the petitioner "largely look[s] past the explicit statutory bases for upsetting an award, and advance[s] a theory based on the judicially crafted ground of 'manifest disregard of the law.'" *See Belesis v. Lowery*, No. 15 Civ. 2633, 2015 WL 4563306, at *1 (S.D.N.Y. July 20, 2015) (internal citation omitted). The Second Circuit has articulated a three-part test for whether the petitioner has met its "heavy burden" of demonstrating manifest disregard:

> First, we must consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators. An arbitrator obviously cannot be said to disregard a law that is unclear or not clearly applicable. Thus, misapplication of an ambiguous law does not constitute manifest disregard. Second, we must find that the law was in fact improperly applied, leading to an erroneous outcome. Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case. Third, we look to a subjective element, that is, the knowledge

> actually possessed by the arbitrators. In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him.

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (alterations omitted) (quoting *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93 (2d Cir. 2008)).

### III. Discussion

The question before the Court is whether the arbitrator manifestly disregarded New York contract law in concluding that Neuman breached the implied covenant of good faith and fair dealing in the employment agreement. (*See* Award at 39.) Both sides agree that the covenant applied to Neuman's decision to terminate Kessler's employment; their only disagreement is over the proper test for evaluating whether or not Neuman acted in good faith. (*See* Dkt. No. 22 at 3.) Kent contends that termination of an employment relationship breaches the covenant of good faith only if it results from "a constitutionally impermissible purpose or [violates] statutory or decisional law." (Dkt. No. 22 at 3.) Kessler counters that, when a contract gives one party the power to make a discretionary decision, the covenant of good faith requires (1) that neither party do anything that will destroy or injure the right of the other party to "receive the fruits of the contract," and (2) that neither party act "arbitrarily or irrationally in exercising its discretion." (Dkt. No. 20 at 14.) The arbitrator agreed with Kessler's understanding of "good faith" under New York law and concluded that Neuman breached the covenant by exercising his contractually conferred discretion in an arbitrary and irrational manner when he fired Kessler for cause.

Kent has failed to meet its burden to prove the first element of "manifest disregard" because it has not demonstrated that "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators." *T.Co Metals*, 592 F.3d at 339 (quoting *Stolt–Nielsen*, 548 F.3d at 93).

6

As an initial matter, Kent relies almost exclusively on *Card v. Sielaff*, 154 Misc. 2d 239, 244 (N.Y. Sup. Ct. 1992), a trial court case, for the proposition that the covenant of good faith is not breached unless an employee can show that he was terminated "for a constitutionally impermissible purpose or in violation of statutory or decisional law." (*See* Dkt. No. 11-1 ¶ 98.) *Card*, however, dealt with the termination of a probationary employee, who, unlike Kessler, "may be discharged at will, . . . and without the provision of specific reasons." *Card*, 154 Misc. 2d at 243–44. Furthermore, unconstitutionality and illegality are better understood as *sufficient* but not *necessary* factors in determining bad faith under New York law. New York appellate courts have confirmed this understanding by phrasing the rule in the disjunctive: "'Judicial review of the determination to discharge [a] probationary employee is limited to an inquiry as to whether the termination was made in bad faith,' *or* 'in violation of statutory or decisional law, or for unconstitutional or illegal reasons.'" *Santoro v. Cty. of Suffolk*, 798 N.Y.S.2d 508, 509 (N.Y. App. Div. 2d Dep't 2005) (emphasis added) (first quoting *Johnson v. Katz*, 68 N.Y.2d 649, 650 (1986); second quoting *Cooke v. Cty. of Suffolk*, 83 N.Y.S.2d 392 (N.Y. App. Div. 2d Dep't 2004)).[3]

The arbitrator thus correctly identified the applicable test for breach of the covenant of good faith under New York law. As the New York Court of Appeals has explained, the implied covenant of good faith, which applies to all New York contracts, imposes special obligations where a contract endows one party with discretion:

> Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in

---

[3] Notably, in *N.Y. State Thruway Auth. v. N.Y. State Div. of Human Rights* (the other case upon which Kent relies), the court similarly phrases the rule in the disjunctive: "Judicial review of the discharge of a probationary employee is limited to whether the determination was made in bad faith or for an improper or impermissible reason." 859 N.Y.S.2d 904 (N.Y. Sup. Ct. 2008).

> the position of the promisee would be justified in understanding were included. This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes *a promise not to act arbitrarily or irrationally in exercising that discretion*.

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (emphasis added) (first quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978); second quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)); *see also State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (articulating the same good faith standard). Thus, the arbitrator did not manifestly disregard New York law when she applied an "arbitrary or irrational" standard to determine whether Kent breached the covenant of good faith.

Nor does the Court agree with Kent that this good faith standard was somehow "improperly applied." (Dkt No. 22 at 4.) The employment agreement indisputably endowed Neuman, as CEO, with discretion to determine whether Kessler's job performance warranted termination for cause. (Employment Agreement at 5.) Therefore, the arbitrator correctly reasoned that the covenant of good faith precluded Neuman from exercising that discretion arbitrarily or irrationally. Based on Neuman's testimony, however, the arbitrator determined that Neuman's decision to fire Kessler was arbitrary. In support of that determination, she cited the following facts: (1) that Neuman's decision was based exclusively on the incident at Challenger Road, even though "[he] conceded that he did not read all of the emails related to [the] investigation" of the incident; (2) that Neuman did not read "all the communication related to Ocasio's claim for unpaid wages" (which included Li's admission that he did not inform Kessler that he had re-hired Ocasio after Kessler told him to fire her); and (3) that Neuman testified that even if he had known about Li's failure to inform Kessler of this fact, it would not have affected his decision to terminate Kessler. (Award at 38.) Finally, Neuman also testified that he had a

8

"gut" feeling that Li was trying to take the fall for Kessler, although he had no proof to support that intuition. (Award at 39.) Because this testimony provides much more than a "barely colorable justification for the outcome reached," the arbitrator's determination that Neuman acted arbitrarily and irrationally must be upheld. *See T.Co Metals*, 592 F.3d at 339 (quoting *Stolt–Nielsen SA*, 548 F.3d at 92).

Kent has failed to establish manifest disregard; therefore, its motion to vacate the arbitration award is denied, and Kessler's cross-motion to confirm the award is granted. *See L'Objet, LLC v. Samy D. Ltd.*, No. 11 Civ. 3856, 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011) ("Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter.").

## IV. Sanctions

Kessler moves for sanctions under 28 U.S.C. § 1927 on the ground that Kent's petition to vacate is "completely meritless and was commenced in bad faith." (Dkt. No. 20 at 20.) Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. §1927. Sanctions are appropriate only if "(1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." *Prospect Capital Corp. v. Enmon*, No. 08 Civ. 3721, 2010 WL 907956, at *4 (S.D.N.Y. Mar. 9, 2010) (quoting *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)).

The Court concludes that § 1927 sanctions are not appropriate here. First, Kent had a colorable basis for its argument. "A claim is entirely without color when it lacks any legal or

9

factual basis." *Id.* "The question is whether a reasonable attorney . . . could have concluded that facts supporting the claim might be established." *Id.* (alteration in original) (quoting *Schlaifer Nance & Co.*, 194 F.3d at 337.) Although the Court ultimately disagreed with Kent's characterization of New York's good faith standard, it cannot be said that Kent's argument had *no basis* in law. Although *Card* was ultimately much less persuasive than the cases cited by Kessler, it can arguably be read to support the proposition that the covenant of good faith is breached only if an employer is motivated by an unconstitutional or otherwise illegal motive. *See* 154 Misc. 2d at 244. Making such an argument was not unreasonable. *Cf. Mitra v. Glob. Fin. Corp.*, No. 09 Civ. 4387, 2010 WL 5095797, at *3 (E.D.N.Y. Oct. 6, 2010) ("These arguments, though rejected . . . , were not entirely frivolous, notwithstanding precedent contrary to [that party's] position."); *contra Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11 Civ. 1529, 2016 WL 2944685, at *3 (S.D.N.Y. May 19, 2016) (concluding that motion was "without color" where it (1) relied on case law that was more than seventy-five years out of date; (2) directly contradicted the Second Circuit's earlier holding in [the] case; and (3) was filed, by [movant's] own admission, to protest several of the Court's prior orders that it found unfair.").

Even if Kent's petition had been without colorable basis, sanctions would still be inappropriate because Kessler has not established bad faith. The Second Circuit has restrictively interpreted the "bad faith" standard under § 1927:

> To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions . . . are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts.

*Herzlinger v. Nichter*, No. 09 Civ. 00192, 2011 WL 4585251, at *4 (S.D.N.Y. Sept. 8, 2011) (quoting *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000)).

10

Here, Kessler has failed to present sufficiently clear evidence of Kent's bad faith. Kessler claims that bad faith can be inferred from Kent's misrepresentation of the facts. (Dkt. No. 20 at 21–22.) But this argument is based on Kent's failure to mention, when recounting Kessler's allegedly poor performance, that the arbitrator explicitly found that Neuman considered only the Challenger Road incident in making her decision. (Dkt. No. 20 at 22; Award at 34.) In other words, the other allegations about Kessler's lackluster performance, he contends, were actually irrelevant and were intended to mislead the Court. This omission alone is not sufficient to establish bad faith.

Furthermore, even if the Court *could* infer bad faith on this basis, it is not required to draw such an inference. *See Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 56 F. Supp. 3d 515, 527 (S.D.N.Y. 2014) ("[T]his standard does not *require* an inference of bad faith, it merely *authorizes* one."). Here, there is an alternative, and less insidious, explanation for Kent's in-depth description of Kessler's history at the company, namely to provide greater context for the parties' employment dispute. *Cf. id.* at 528 ("Springut has not provided clear evidence of bad faith; rather, on the facts as presented, more than one equally plausible scenario exists.") That Kent recounted facts tending to cast its actions in a better light is neither impermissible nor particularly surprising.

In short, Kessler has not introduced sufficient evidence to support his contention that Kent's motion to vacate was dilatory or otherwise brought in bad faith.

## V. Conclusion

For the foregoing reasons, Kent's motion vacate the arbitration award is DENIED, and Kessler's motion to confirm that award is GRANTED. Kessler's motion for sanctions is DENIED. Judgment shall be entered accordingly.

11

The Clerk of Court is directed to close the motion at Docket Number 19 and to terminate this case.

SO ORDERED.

Dated: March 14, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge